IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| NORTHEAST INDUSTRIES LLC  AND | : | |
| JOSEPH DELUCA | : | |
|  | : | CIVIL ACTION |
| Plaintiffs | : | |
|  | : | |
| v. | : | NO.: 2:18-cv-04379-JS |
|  | : | |
| ON TARGET LABORATORIES LLC, ON | : | |
| TARGET LABORATORIES, INC., AND | : | *Jury Trial Demanded* |
| MARTIN R. LOW | : | |
|  | : | |
| Defendants. | : | |

_____

## PLAINTIFFS' PRETRIAL MEMORANDUM

Plaintiffs Northeast Industries LLC and Joseph DeLuca (together, "Plaintiffs"), by and through their counsel, respectfully submit this Pretrial Memorandum in accordance with Local Rule 16.1(c) of the Local Rules of Civil Procedure of the United States District Court for the Eastern District of Pennsylvania and this Court's January 22, 2019 Scheduling Order.

### I.  STATEMENT OF THE NATURE OF THE ACTION AND BASIS FOR JURISDICTION OF THE COURT

The claims in this action arise from Plaintiffs' work aiding Defendants to secure financing for the growth of their enterprise.  In that work, Plaintiffs brought to bear proprietary processes, skills, expertise, contacts, and other trade secrets that Plaintiffs had developed and amassed over decades.  Among other things, Plaintiffs introduced Defendants to several potential sources of investment, including Medtronic, and, crucially, Johnson & Johnson Innovation – JJDC, Inc. ("J&J Innovation"). In their contemporaneous writings, Defendants admitted that Plaintiffs had made such "introductions" and "connections."  The introduction to J&J resulted in a successful financing for Defendants.  Under the terms of a Consulting Agreement among the parties, Plaintiffs were

thereby entitled to collect a success-based payment.  Indeed, the largest single source of payment stemming from the Consulting Agreement, by far, was the payment resulting from a successful financing.

When it came time, however, for Defendants to make good on their contingent payment obligations – again, by far the largest component of Plaintiffs' compensation – Defendants refused to pay Plaintiffs their duly-earned fee.  Tellingly, Defendants had at no point previously designated J&J Innovation or any of its people as "introduction[s]" to be "carved out" from the purview of Plaintiffs' entitlement to the success-based fee.

However, when the financing was consummated (and when the documents themselves were in fact signed by Kadir Kadiresan), Defendants failed to honor the Consulting Agreement. Initially, Defendants offered Plaintiffs $10,000.  When DeLuca pressed Low on the contract, he learned that Low had not properly informed the Board of Plaintiffs' role in obtaining financing. Low responded to DeLuca by complaining that he was worried about losing his job, and attempted to cajole DeLuca into participating in what could only be described as a fraud upon Defendant companies.  DeLuca rejected Low's approach, and insisted that Low be straight with the Board about the existence and terms of the Consulting Agreement.  Subsequently, Defendants declared that the Consulting Agreement was simply void, though in the present litigation, Defendants have retreated from that position.

In this action, Plaintiffs have brought three claims: (1) Misappropriation of Trade Secrets; (2) Unjust Enrichment; and (3) Breach of Contract.

This Court has subject matter jurisdiction of this lawsuit under 28 U.S.C. § 1331 insofar as the lawsuit involves a federal question arising under Section 18 U.S.C.A. § 1836.

## II.     <u>STATEMENT OF THE FACTS OF THE CASE</u>

In early 2015, Defendant Martin R. Low ("Low") initiated the first contact with Plaintiffs, soliciting DeLuca directly for his advice and guidance regarding a fledgling investor financing initiative just begun by Defendants On Target Laboratories LLC and On Target Laboratories, Inc. (together, "On Target").   These initial discussions ultimately led to the negotiation and consummation of a Consulting Agreement between Plaintiffs and Defendants.   *See* Consulting Agreement (Exhibit P-1) OTL001585-90.

Under the contract, Defendants agreed to pay Plaintiffs a hybrid fee for their efforts that was comprised of three components: (1) reimbursement of expenses, (2) reimbursement for hourly work, and (3) a small percentage of a financing where Plaintiffs had made an "introduction."   *See* ¶¶5, 3, and 4, respectively, of the Consulting Agreement.   Although contingent, the third success-based fee comprised by far the largest component of potential compensation under the Consulting Agreement.

As the Consulting Agreement reflects, the parties contemplated at the time of contracting the very type of dispute now in suit.   They agreed in advance upon a simple and certain way to avoid such disagreements via a "carve-out" mechanism.   This carve-out mechanism allowed Defendants to identify and exclude any pre-existing contacts and relationships from the purview of "introduction[s]" that would otherwise entitle Plaintiffs to the success-based portion of the hybrid fee arrangement:

> Company shall have the right to carve out any Investors ("Carved Out Investor") by notifying Consultant, in writing, before Consultant contacts the Investor.  If Company closes a Financing with an Investor and Investor is a Carve Out Investor, then the Consultant shall not be entitled to a Bonus, unless otherwise agreed by the Company and the Consultant.

*See* Consulting Agreement at ¶4 OTL0001586.

Neither at the time of contracting, nor at any point thereafter, did Defendants designate J&J Innovation as a "Carve Out Investor." Nor did they, in fact, ever designate J&J or any J&J-related entities either. They could have, but did not. Indeed, Defendants availed themselves of the carve-out mechanism for certain of their pre-existing contacts around the time of engaging Plaintiffs, but did not carve out J&J.

Plaintiffs worked with Defendants thereafter in a variety of ways, including with an aim toward finding a financing source. Such work included Plaintiffs' resort to proprietary processes for engaging with very large institutions, as well as a resort to proprietary contact lists and searching methodologies, including Plaintiffs' contacts via LinkedIn.[1] As Plaintiffs testified, in part:

---

[1] *See e.g.,* Email dated April 15, 2015 NE IND 002659-60 (providing Plaintiffs' methodology for structuring the On Target investor pitch (stating, in part, that "the way to do it is to make them principals of the entity" with specific examples); Email dated April 29, 2015 NE IND 002667 (providing Plaintiffs' methodology and suggestions for the organization of and topics to be included in the On Target investor deck(s)); Email dated May 4, 2015 with attachment NE IND 002685-704 (same attaching a template deck for Defendants' review); Email dated May 18, 2015 with attachment NE IND 002971-3016 (providing Plaintiffs' methodology for creating a compelling investor pitch deck for On Target, disclosed, in part, by providing Defendants with a fully customized, working draft of an investor pitch deck, which was developed and periodically revised by Plaintiffs exclusively for On Target's use with its various target investors, among other things); Plaintiffs' legal pad notes dated June 5, 2015 NE IND 002046 (outlining Plaintiffs' methodology for effective networking and pinpointing decision-makers and potential deal champions within the On Target space, including identifying J&J Innovations as an optimal target investor and leveraging direct contacts with Amit Ray (Chief Medical Officer at Janssen Pharmaceutical Companies of Johnson & Johnson) and Derrick Lenz (former Boston Scientific colleague of then-Vice President of J&J Innovations, Kadir Kadhiresan) to make contact with Mr. Kadhiresan, an investment decision-maker within J&J Innovations); Email dated May 20, 2015 with attachment NE IND 003166-67 (providing Plaintiffs' methodology for targeting and facilitating productive initial discussions with potential investors with relevant attached example); Email dated May 21, 2015 with attachment NE IND 003319-38 (providing Plaintiffs' methodology for targeting and facilitating productive initial discussions with potential investors with attached revised deck); Email dated May 28, 2015 with attachment NE IND 003383-3402 (providing Plaintiffs' methodology for targeting and facilitating productive initial discussions with potential investors with attached revised deck); Email dated June 5, 2015 with attachments NE IND 003414-42 (providing Plaintiffs' methodology for targeting and facilitating productive initial discussions with potential investors with attached revised deck and expense reimbursement request); Email dated June 8, 2015 NE IND 003450-51 (providing Plaintiffs' methodology for targeting and facilitating productive initial discussions with potential investors, first flagging J&J Innovation as a viable investor source); Email dated July 6, 2015 with attachment NE IND 003852-53 (proving Plaintiffs' methodology and techniques for better attracting and capturing investor interest by framing preferred exit strategies for the company); Email dated September 22, 2015 NE IND 004409-10 (proving Plaintiffs' methodology and techniques for thoughtfully structuring and successfully negotiating key deal terms with potential investors, advising Low that the "following is a long list of key terms to consider in any 'deal'."); Plaintiffs' legal pad notes NE IND 002022-75 (evidencing various of Plaintiffs' methodologies and techniques); and Plaintiffs' small notepad notes NE IND 002076-82 (evidencing various of Plaintiffs' methodologies and techniques).

>    [M]y process was multifaceted.  One part of which is to
>    know, after many years of experience, what types of things do
>    investors, specifically, need to hear about, talk about, see in a
>    presentation and, then, in subsequent conversations with them and
>    to pull that information out of the company – in this case, On Target
>    – distill it into something that is easily communicated in the right
>    way and put it into a deck and, then, to talk about it in a coherent,
>    consistent way.  That's one part of it.
>
>    The other part of it is to pull from my proprietary list of
>    contacts, people that I know or people that I can know that I have
>    connections to, through my network of 20-plus years of working in
>    this industry, and to use that proprietary list of contacts and that
>    network to figure out a strategic way to approach the right pockets
>    of money within large global organizations, that are likely to make
>    investments or to be helpful in getting to a point where an
>    investment is made and knowing that approach and knowing how to
>    use that contact network and knowing how to target those pockets
>    of money or those places in organizations where people can be
>    helpful to get you to other parts of the organization and coupling that
>    with the content, the intellectual project of knowing what to say to
>    them when you get to them and how to position it, that's my
>    proprietary methodology and it is an iterative process.

DeLuca Deposition Tr. 178:23 – 180:7.

Throughout the course of Plaintiffs' work for On Target, Plaintiffs were repeatedly lauded by Defendants.  Low repeatedly told DeLuca things like, "I truly appreciate your help," *see* Email dated June 3, 2015 (Exhibit P-3) OTL001842, "This is absolutely fantastic," *see* Email dated June 8, 2015 NE IND 003462-63, "You are not getting paid enough," *see* Email dated October 23, 2015 NE IND 004513.

It became apparent to Plaintiffs that On Target needed a champion at J&J Innovation, a subsidiary of J&J, and would need to solicit funding from J&J Innovation directly.  As Plaintiff DeLuca wrote to Defendant Low on or about June 8, 2015, "Upon further research, I think a good starting place at J&J might also be J&J Innovation.  That group's is [sic] purpose is to partner with entrepreneurs and fund companies.  I have a couple of contacts there, too, in addition to the CMO. Let me know."  *See* Email dated June 8, 2015 NE IND 003450-51.  Defendant Low agreed with

DeLuca, and asked Plaintiffs to bring their own contacts and influence to bear on J&J Innovation. In fact, at one point about half a year into Plaintiffs' engagement, Defendant Low could not even recall the significance of J&J Innovation, asking Plaintiff DeLuca to remind him of its import in connection with advancing On Target's financing efforts:

> Joe,
> Let me know what you think. Sounds good, **not sure what it means to be passed over to the innovations group**. Are they just the folks responsible for due diligence or are we being passed to them because we don't quite fit in Global Surgery? Give me a call when you have a moment to discuss. Thanks — Marty

*See* Email dated January 6, 2016 NE IND 004601 (emphasis added).

Among many other activities surrounding J&J Innovation, Plaintiffs identified different individuals associated with J&J.  Those individuals included Kadir Kadiresan at J&J Innovation, whom Plaintiffs targeted for introduction, as well as other J&J contacts, like Amrit Ray and Kareen Bacinski, in order to ultimately obtain financing for On Target.

As early as January 2016, Defendants recognized the "fairly significant role in the success with J&J to date" that Plaintiffs had initiated and quickly assumed, in an email Defendant Low. *See* Email dated January 22, 2016 (Exhibit P-11) OTL001699.

In the months thereafter, Defendants admitted in writing that Plaintiffs had "connected" Defendants to elements of J&J and had "partially introduced" J&J.  Specifically, on July 5, 2016, Defendant Low admitted that Plaintiff DeLuca "is actually the guy who connected us to Medtronic and the Global Surgery Side of J&J."  *See* Email dated July 5, 2016 (Exhibit P-13) OTL001546. On March 16, 2016, Defendant Low also in email referred to Plaintiff DeLuca as "a good friend of mine and responsible, in part, for introducing J&J and fully responsible for Medtronic."  *See* Email dated March 16, 2016 (Exhibit P-12) OTL001738-40.

A subsequent financing closed in September 2017, with J&J Innovation as the lead investor.  Low Deposition Tr. 41:2 – 9.  Defendant Low repeatedly testified that the amount of J&J Innovation's portion of the financing was $18 million.[2]  Low Deposition Tr. 39:20, 43:1 – 5, 147:10 – 13.

This should have been the end of the story – introduction made, Plaintiffs' success-based payment earned upon any subsequent financing.

However, when the financing was consummated (and when the documents themselves were in fact signed by Kadir Kadiresan – *see* Amended and Restated Series B Preferred Stock Purchase Agreement dated February 13, 2018 (Exhibit P-15) at OTL000421), Low offered Plaintiffs $10,000.  As DeLuca testified about one of this meetings with CEO Martin Low:

> When we met for breakfast in December before the holidays, he had told me that the On Target investment had closed, that Johnson & Johnson was one of the investors, and he said things to the effect of we would never have gotten there without you, Joe. And I talked to the board about this and I tried to get you what you're owed, I tried to get you more money, but I'm only able to get you $10,000.  That's all he would agree to.  I'm sorry.

DeLuca Deposition Tr. 176:5 – 14.

DeLuca rejected the money; nevertheless Defendants mistakenly sent him a tax form in the mail reflecting payment.  *Id.* at 178:1-16.  When DeLuca reminded Low of the Consulting Agreement, Low admitted that he had a different problem: he had not been candid with his Board. The nature of this failure became clear when Low admitted that he had not properly informed the Board of Plaintiffs' role in obtaining financing, and then complained that he was worried about

---

[2] After the close of discovery, Defendants made a late production of certain documents that suggest that the total amount of J&J Innovation's financing was not less than $16,648,132.94.  *See* OTL001921-35.

losing his job, and attempted to cajole DeLuca into participating in what could only be described

as a fraud upon Defendant companies.  DeLuca refused to engage in Low's proposed scheme.

Once informed of the Consulting Agreement, Defendants took the position that the

Consulting Agreement was void.  Their defense has since evolved.

## MONETARY DAMAGES CLAIMED

Plaintiffs are entitled to recover from Defendants the following amounts:

| Categories of Damages | Basis of Entitlement / Method of Calculating | Approximate Amount |
|---|---|---|
| Any accrued, unpaid "Bonus" with respect to J&J Innovation | Paragraph 4 of the Consulting Agreement states: "If Company closes a Financing with an Investor that Consultant introduces to Company, and Investor is not a Carved Out Investor (defined below), then the Company shall pay Consultant a Bonus equal to 3.0% of the aggregate amount of the Financing received by Company from the Investor." | Between $540,000 and $499,443.99. |
| Remedies for the misappropriation of any trade secrets | Applicable common law and statutory law, including without limitation the "Remedies" as set forth in 18 U.S.C.A. §1836 / Alternative Calculations: <br>• Damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss (*see* | Between $540,000 and $499,443.99. |

| | | |
|---|---|---|
| | §1836(b)(3)(B)(i)(I) and (II)); or<br>• Damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret (*see* §1836(b)(3)(B)(ii)). | |
| Exemplary damages for trade secrets willfully and maliciously misappropriated | Applicable common law and statutory law, including without limitation the "Remedies" as set forth in 18 U.S.C.A. §1836 / ". . . if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)" (*see* §1836(b)(3)(C)). | Between $1,080,000 and $998,887.98. |
| Quasi-contractual damages, in the alternative of breach of contract damages | Applicable common law and statutory law, awarding Plaintiffs the value of the benefit conferred upon Defendants, the retention of which would be unjust under the circumstances. *See generally Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 668 (Pa. Super. Ct. 2007). | A minimum of $540,000 or $499,443.99, as applicable. |
| Pre- and Post-judgment interest | Applicable common law and statutory law. *See, generally TruServ Corp. v. Morgan's Tool & Supply Co., Inc.*, 39 A.3d 253, 263 (Pa. 2012) | Pre-judgment interest shall be awarded on a definite sum of money found to have been wrongly withheld by Defendants (between |

| | | |
|---|---|---|
| | (providing for the recovery of pre-judgment interest as a matter of right for a definite sum of money from the date performance was due); 41 P.S. § 202 (defining the "legal rate of interest" as six percent *per annum*); 28 U.S.C. § 1961 (providing for the recovery of post-judgment interest on a judgment rendered in a district court as a matter of right). | $540,000 and $499,443.99), calculated from the date such sum first came due on September 28, 2017 (the J&J Innovation closing date) through to yesterday's date (or 644 days) and then continuing from July 3, 2019 until the date of the entry of judgment in favor of Plaintiffs and against Defendants, at the rate of six percent (6%) per annum (or between $88.77 and $82.10 *per diem*).  The amount of accrued pre-judgment interest, as of July 2, 2019, is between $57,079.11 and $52,790.30.<br><br>Post-judgment interest shall accrue on any money judgment entered in favor of Plaintiffs and against Defendants herein, to be calculated from the date of the entry of such judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. |
| Costs of suit | Applicable common law and statutory law.  *See generally* Fed. R. Civ. P. 54, Judgment; Costs, and 28 U.S.C.A. § 1920, Taxation of costs. | Plaintiffs shall file a Bill of Costs, seeking to include the following recoverable costs (other than attorneys' fees) as a prevailing party, including (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; |

| | | (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services, as applicable. |
|---|---|---|
| Punitive damages | Applicable common law and statutory law, awarding punitive damages "when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others," *see Hall v. Episcopal Long Term Care*, 54 A.3d 381, 395 (Pa. Super. Ct. 2012), in an amount that is "reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion," *see Shiner v. Moriarty*, 706 A.2d 1228, 1241 (Pa. Super. Ct. 1998) (citation omitted). | To be determined. |
| Other relief the Court deems equitable and just | Applicable common law and statutory law. | To be determined. |

### III.   PLAINTIFF'S LIST OF WITNESSES

Plaintiff reserves the right to call any of the witnesses identified by Defendants and the right to call additional witnesses in rebuttal, the identity of whom cannot be known until the presentation of Defendants' case.  Additionally, Plaintiff reserves the right to call the following witnesses at trial:

### A.   FACT WITNESSES

1.   Joseph DeLuca
c/o Peter N. Kessler, Esq.
Kutak Rock LLP
1760 Market Street
Suite 1100
Philadelphia, PA 19103

2.   Martin Low
c/o Brian C. Deeney, Esq.
LeClair Ryan
One Riverfront Plaza
1037 Raymond Boulevard
Sixteenth Floor
12 Newark, New Jersey 07102

3.   French Fritz
c/o Brian C. Deeney, Esq.
LeClair Ryan
One Riverfront Plaza
1037 Raymond Boulevard
Sixteenth Floor
12 Newark, New Jersey 07102

### IV.   PLAINTIFF'S SCHEDULE OF EXHIBITS

A schedule of the exhibits that Plaintiff anticipates offering at trial is attached hereto as Exhibit A.  Plaintiff reserves the right to supplement his exhibit list and the right to identify additional exhibits in rebuttal, the identity of which cannot be known until the presentation of Defendants' case.  Plaintiff will also use deposition transcripts.

## V.     ESTIMATE OF TRIAL DAYS

Three (3) days.

## VI.     SPECIAL COMMENTS REGARDING OUTSTANDING ISSUES

There are five outstanding issues presently pending before the Court and ripe for its adjudication: (1) Defendants' contested Motion for Summary Judgment, (2) Plaintiffs' uncontested Motion in *Limine* To Preclude Evidence Of, Mention Of, Or Testimony Regarding Previous Lawsuits, (3) Defendants' contested Motion in *Limine* to Preclude Evidence of Settlement Discussions, (4) Defendants' contested Motion in *Limine* to Preclude Evidence that On Target's Board Did Not Approve the Consulting Agreement, and (5) Defendants' contested Motion in *Limine* to Preclude Evidence that Plaintiffs Made Introductions to Companies other than Johnson & Johnson.

Respectfully submitted,

KUTAK ROCK LLP

Dated: July 3, 2019                    */s/ Peter N. Kessler*
                                       Oliver D. Griffin, Esq.
                                       Peter N. Kessler, Esq.
                                       Melissa A. Bozeman, Esq.
                                       1760 Market Street, Suite 1100
                                       Philadelphia, PA 19103
                                       Tel 215.299.4384
                                       Fax 215.981.0719

## **CERTIFICATE OF SERVICE**

I, Peter N. Kessler, do hereby certify that on July 3, 2019, I served a true and correct copy of the foregoing Pretrial Memorandum on all parties via the Court's Electronic Filing System.

*/s/ Peter N. Kessler*
Peter N. Kessler